[780 NYS2d 314]

In the Matter of KENNETH HELLER, an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, June 24, 2004

### APPEARANCES OF COUNSEL

*Thomas J. Cahill, Chief Counsel*, Departmental Disciplinary Committee, New York City (*Mady J. Edelstein* of counsel), for petitioner.

*Sokolski & Zekaria, P.C.* (*Robert E. Sokolski* of counsel), for respondent.

### OPINION OF THE COURT

Per Curiam.

Respondent Kenneth Heller was admitted to the practice of law in the State of New York by the Second Judicial Department on October 19, 1955. At all times relevant herein, respondent has maintained an office for the practice of law within the First Judicial Department.

On December 12, 2002, the Departmental Disciplinary Committee (the Committee) served respondent with a notice and statement of charges alleging 11 counts of professional misconduct involving three separate matters: *Heller v Provenzano* (Charges 1-6), a personal injury case tried in 1996 in which he was the plaintiff and which, on appeal to this Court, we remanded for a new trial on liability and damages before a different judge, based on respondent's serious misconduct, and affirmed a "relatively mild" sanction of $10,000 (257 AD2d 378, 379 [1999]); *Stajano v United Tech. Corp.* (Charges 7-9), a personal injury matter involving a 1971 helicopter crash in Uruguay where respondent served as plaintiffs' counsel and which concluded with dismissal of the complaints in 2002 (unanimously affirmed by this Court at 5 AD3d 260 [2004]); and the *Bruker* litigation (Charge 10), a small claims breach of contract matter brought in late 1997 against respondent, his law firm and a company he controlled. Charge 11 embraced the totality of his conduct in the 10 preceding charges.

The charges arising out of *Heller v Provenzano* are based on respondent's improper presence in a jury selection room and improper communication with prospective jurors in a matter in which he was a party, deemed a violation of Code of Professional Responsibility DR 7-108 (a) (22 NYCRR 1200.39) and of DR 1-102 (a) (5) (22 NYCRR 1200.3), engaging in improper communication with prospective jurors and conduct prejudicial to the administration of justice (Charge 3); his subsequent false

testimony at a deposition before the Committee (Charge 1) and false posttrial affidavit to the Supreme Court, dated September 9, 1996 (Charge 2) with regard to said conduct, deemed a violation of DR 1-102 (a) (4), intentionally engaging in conduct involving dishonesty, fraud, deceit or misrepresentation, and of DR 1-102 (a) (5), conduct prejudicial to the administration of justice; his refusal to abide by the trial court's instruction to remain seated during trial, deemed a violation of DR 1-102 (a) (5), engaging in conduct prejudicial to the administration of justice, and of DR 7-106 (a) (22 NYCRR 1200.37), disobeying a standing order of a tribunal (Charge 4); his shouting at and threatening the Trial Judge with a complaint to the Commission on Judicial Conduct in the course of his trial testimony, deemed a violation of DR 1-102 (a) (5), engaging in conduct prejudicial to the administration of justice, and of DR 7-106 (c) (6), undignified or discourteous conduct which is degrading to a tribunal (Charge 5); and his reference, during his testimony before the jury, to a matter previously ruled inadmissible, and his efforts, also during his testimony before the jury, to curry favor improperly with Hispanic jurors, deemed a violation of DR 1-102 (a) (5), engaging in conduct prejudicial to the administration of justice, and of DR 7-106 (a), violation of a tribunal's ruling (Charge 6).

The charges arising out of *Stajano v United Tech. Corp.* are based on respondent's disruptive, offensive, obstructionist and intimidating manner during referee-supervised pretrial examinations, deemed a violation of DR 1-102 (a) (5), conduct prejudicial to the administration of justice, and of DR 7-106 (c) (6), undignified or discourteous conduct degrading to a tribunal (Charge 7); his delay and disruption of physical and psychological examinations, deemed a violation of DR 1-102 (a) (5), conduct prejudicial to the administration of justice (Charge 8); and his failure to adhere to repeated rulings regarding his conduct during pretrial depositions and examinations, deemed a violation of DR 7-106 (a), a disregard for a standing order of a tribunal (Charge 9).

The charges arising out of the *Bruker* litigation are based on respondent's use of harassing tactics against a pro se party and his failure to pay sanctions timely as ordered by the court, deemed a violation of DR 1-102 (a) (5), conduct prejudicial to the administration of justice, and of DR 7-102 (a) (1) (22 NYCRR 1200.33), conduct of a defense and delay of a trial merely to harass or maliciously injure another (Charge 10).

Charge 11 accuses respondent, based upon the totality of the misconduct at issue, of conduct that adversely reflects on his fitness to practice law (DR 1-102 [a] [7]).

On January 21, 2003, respondent answered the 11 disciplinary charges. He denied all of the allegations except that he admitted calling an examining psychiatrist in the *Stajano* case a "charlatan"; he also raised affirmative defenses and denied his behavior violated the Code of Professional Responsibility.

Beginning on June 23, 2003, a Referee conducted an evidentiary hearing. The hearing resulted in the Referee sustaining Charges 3, 4, 6, 7, 8, and 11 in toto, and Charges 5 and 10 in part, and recommending that respondent be suspended for two years. A Hearing Panel heard oral argument on January 13, 2004, and by a report dated March 26, 2004, concurred with the Referee's findings and sanction recommendation.

The Committee now moves for an order confirming the Referee's report and Hearing Panel's determination and imposing such sanction as this Court deems proper but not less than a two-year suspension, as recommended by the Referee and Hearing Panel. Respondent opposes and asks this Court to deny and dismiss the Committee's petition or, in the alternative, reject the sanction recommendation as excessive and award him such other relief as this Court deems proper.

As an initial matter, we concur with the findings of fact and conclusions of law as found by the Referee and confirmed by the Hearing Panel with regard to Charges 3, 4, 6, 7, 8, and 11, which were properly sustained in full, and Charges 5 and 10, which were properly sustained in part, based upon the extensive record before us. However, we find, in addition, that Charges 1 and 2 should have been sustained.

Although the Referee found that the improper contacts with jurors did occur, he noted the appearance of inconsistency between that finding and his dismissal of charges that respondent offered false evidence in denying such communication. Finding it to be a "close" question "not free from doubt" as to whether the Committee proved the latter violations by a fair preponderance of the evidence, the Referee dismissed Charge 1. He based his determination on respondent's testimony of a memory loss at his deposition, which was confirmed by a December 2002 neuropsychological test. This evidence averred that respondent suffered significant memory loss due to kidney surgery several months before the November 2000 deposition before the Committee. However, the record shows that respondent's hearing

testimony that he was hospitalized and unconscious for five weeks, due to cardiac arrest after his May 2000 kidney surgery, is unsupported by his treating physician's contemporaneous affidavit, dated and submitted to the Committee in November 2000, which did not report cardiac arrest or loss of consciousness in describing his May 2000 hospitalization. Moreover, the neuropsychological test, performed two years after the deposition, tested the then 73-year-old respondent's memory against the norm for a person 32 years old, and repeated respondent's allegations that he suffered cardiac arrest and loss of consciousness after the May 2000 surgery. Given the foregoing, we see no basis for crediting respondent's self-serving evidence in the particular instance of Charge 1, especially since the Referee ultimately concluded that, in general, respondent's testimony before him "was not candid."

We would also sustain Charge 2, which addressed respondent's purported false affidavit executed four months after the *Provenzano* trial denying any conversation with prospective jurors. The Referee and Hearing Panel dismissed this charge on the basis that respondent claimed that counsel prepared the affidavit and respondent was entitled to reasonably rely on the draftsmanship of his counsel. In our view, however, it strains credulity that respondent, the self-proclaimed "zealous advocate," would sign a critical affidavit in a serious matter without thoroughly vetting it. In any event, in signing an affidavit, an affiant swears to the truth of the statements therein.

Also in *Provenzano*, it should be noted, respondent defied repeated instructions by the Trial Judge to remain seated during trial. Indeed, opposing counsel testified that respondent's wandering seemed timed to distract the jury when events favored the defense. The Referee in the instant proceeding opined that "[t]he spectacle of a lawyer roaming the courtroom despite orders to be seated degrades the administration of justice." The Referee rejected respondent's argument that pain from an old hip injury excused his disobedience of the court's order noting that respondent had sat through hearings of up to four hours duration before him without seeming discomfort or complaint. Moreover, during respondent's direct examination in *Provenzano*, he engaged in a shouting tirade in which he unfavorably compared the Trial Judge to three other allegedly abusive Supreme Court Justices he had known. He then threatened to report the Trial Judge to the Commission on Judicial Conduct. Although the trial transcript indicates that

the jury was escorted out as the tirade began, there was testimony that at least three jurors observed the entire incident. The Referee found respondent's screaming abuse at the bench "degrad[ed] the administration of justice." Finally, the Referee found that respondent's disagreement with the Trial Judge's ruling in *Provenzano* that there be no mention of a prior, unrelated fatal accident that occurred at the location at issue "became seething anger." The Referee wrote: "In apparent retaliation and in clear violation of the justice's earlier ruling, respondent gratuitously described the prior fatal accident in the garage elevator . . . Nothing in [counsel's] questions should have elicited the forbidden reference . . ."

On the issue of sanction, circumstances cited in mitigation include the 75-year-old respondent's age, his preeminence as a maritime attorney, praise from two judges in previous cases, his apology to the Trial Judge in *Provenzano*, and that given his age, a longer suspension would amount to disbarment.

Aggravating circumstances include respondent's 24-year history of sanctions, which includes a 1999 private admonition from the Committee, sanctions by courts on five occasions since 1984, and sharp criticism by courts on at least six other occasions since 1980; respondent's conduct during this disciplinary proceeding in ignoring evidentiary rulings, submitting evidence that had been ruled inadmissible by the Hearing Panel, and lacking candor in his testimony before the Referee; his persistent rationalizations in denial of his misconduct; and the lack of remorse or acknowledgment by respondent that his conduct was harmful and inappropriate.

The Referee concluded, after observing and listening to respondent at the hearing, and reviewing the extensive record, that "[respondent] believes that all who stand in his way—whether they be opposing counsel, opposing litigants (particularly insurers), trial justices, justices of the Appellate Division, official referees or examining physicians—are villains corrupted by malice or bias or both." In the words of the Hearing Panel, respondent engaged in an "ingrained pattern of angry, offensive, and obstructionist behavior." Respondent excuses his conduct by claiming, among numerous other things, that he is an overzealous advocate; the reality is, in the words of the Committee, that he has engaged in a "pattern of abusive conduct directed at virtually every element of the judicial system" for at least the last 20 years.

One other particularly indicative instance of respondent's conduct stands out on the record before us. In the *Stajano* mat-

ter, respondent produced four of his clients for psychiatric examinations by a Dr. Nassar. Respondent was confrontational, made insulting remarks to Dr. Nassar, and interrupted the examinations frequently, often in a loud voice. Before the examination of the second client, Dr. Nassar attempted to enlist respondent's cooperation. Dr. Nassar testified at the disciplinary proceeding that respondent nevertheless remained very confrontational, even going so far as to state: "listen, I could take you, I've taken bigger guys than you, and you don't scare me . . . Don't think you can push me around." Respondent went on to interrupt this examination at least 49 times, sometimes using foul language, and he repeatedly called Dr. Nassar a "charlatan" and referred to him as "Abdul Gamal." Dr. Nassar was unable to complete his evaluations, and wrote to the Trial Judge that he "had never encountered such inappropriate, unprofessional, disrespectful, and outrageous behavior from an attorney." The Judge ordered that a referee supervise the remaining two examinations.

The next examination took place with Dr. Nassar, respondent, a court reporter, two interpreters and one of the clients crowded into the Referee's office. Respondent began by calling Dr. Nassar a "charlatan" and, disregarding the Referee's instructions, continued to interrupt with objections and frequently complained that he could not hear the questions and answers despite sitting immediately behind his client and less than four feet from Dr. Nassar. (In this regard, the Referee at the disciplinary hearing commented that he observed no inability on respondent's part to follow the proceedings from up to 20 feet away, or to conduct whispered conversations with counsel.)

It was more of the same at the next day's examination of another client. The Referee stated, "respondent was so vehement and violent that [the referee] feared for his safety; and instructed a court officer to attend." Indeed, the Referee testified that respondent had lifted a chair over his head in a threatening manner. In his testimony, respondent conceded that he was angry with the Referee. He stated, however, that he only picked up his chair to move it over.

The examination Referee's report described respondent's conduct as a "frivolous, orchestrated, intentional and willful effort" to obstruct and delay discovery; he was "willfully and intentionally disrespectful to [the trial judge]" and the Referee

himself. The Referee recommended that respondent be held in contempt and sanctioned $10,000.

In light of the cumulative evidence of respondent's 24-year history of sanctions, his perverse and persistent refusal to accept adverse rulings, reflective of an utter contempt for the judicial system, and his consistent, reprehensible, unprofessional behavior, which has included screaming at, threatening and disparaging judges, adversaries and experts, intentionally defying court rulings, and disrupting and thwarting proper legal process through both physical and verbal aggression, we are of the opinion that the appropriate sanction here is disbarment.

Respondent's persistent misconduct, up until and including this proceeding, in the face of 24 years of prior sanctions and published criticisms indicates that the most serious sanction is warranted (*see e.g. Matter of Kramer*, 247 AD2d 81, 82 [1998], *lv denied* 93 NY2d 883 [1999], *cert denied* 528 US 869 [1999] [pattern of violations and "habitual misdeeds" over several years including willful disobedience of discovery orders and false statements in affidavits, not merely indicative of a tough litigator]; *Matter of Pollack*, 238 AD2d 1 [1997] [attorney disbarred where chronic unrestrained misconduct and failure to learn from past and rehabilitate himself]; *Matter of Robb*, 287 AD2d 1 [2001] [attorney's pattern of dilatory and obstructive misconduct throughout disciplinary proceeding, demonstrating his disregard for the rule of law and the ethical standards of the profession, a proper consideration in court's decision to disbar]). Such cumulative misconduct adversely reflects on his fitness to practice law (*see Matter of Klapper*, 253 AD2d 72 [1999] [attorney disbarred where multiple violations in four matters including use of profanity, degrading witnesses and engaging in disruptive conduct that showed aggravated disrespect for courts, witnesses, adversaries, and prior discipline]).

Accordingly, the Committee's petition should be granted to the extent of confirming the Hearing Panel's determination insofar as it recommended sustaining in full Charges 3, 4, 6, 7, 8, and 11, and sustaining in part Charges 5 and 10, the petition denied to the extent that it seeks to confirm the Hearing Panel's dismissal of Charges 1 and 2 and to impose the sanction of a suspension of at least two years, Charges 1 and 2 reinstated and

sustained, and respondent disbarred, and his name stricken from the roll of attorneys.

WILLIAMS, J.P., LERNER, FRIEDMAN, MARLOW and GONZALEZ, JJ., concur.

Respondent disbarred from the practice of law in the State of New York, effective July 26, 2004, as indicated.